Filed 12/10/15  P. v. Casillas CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>OMAR CASILLAS,<br><br>    Defendant and Appellant. | F068294<br><br>(Super. Ct. No. RF006526A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Michael G. Bush and John S. Somers, Judges.*

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Caely E. Fallini, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Judges Lua and Bush presided over the defendant's pretrial motions to substitute his trial counsel.  Judge Somers presided over the defendant's posttrial motions to substitute his trial counsel, trial, and sentencing.

# INTRODUCTION

Omar Casillas was convicted at the conclusion of a jury trial of attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a), count 1), assault with a semiautomatic firearm (§ 245, subd. (b), count 3), being a felon in possession of a firearm (§ 29800, subd. (a)(1), count 4), and being a felon in possession of ammunition (§ 30305, subd. (a)(1), count 5). The jury acquitted defendant of kidnapping for ransom (§ 209, subd. (a), count 2), but found him guilty of the lesser included offense of felony false imprisonment (§ 236). The jury found true a firearm enhancement alleged as to count 1 (§ 12022.53, subd. (c)).

Defendant was sentenced to prison for nine years on count 1 plus 20 years for the gun enhancement and to a concurrent sentence of three years on count 2. Defendant's sentences on the remaining counts were stayed pursuant to section 654.

Defendant appeals contending the trial court erred in denying his multiple requests for substitute counsel brought pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). Defendant asserts his trial counsel was ineffective, there was a breach of the attorney-client relationship, and the trial court erred in failing to appoint independent counsel to investigate the effectiveness of his trial counsel.

Defendant further argues he was deprived of effective assistance of counsel because counsel failed to seek dismissal of the allegation defendant was a felon in possession of a firearm as it had been dismissed twice before. Defendant contends the trial court's instruction on felony false imprisonment was erroneous, requiring reversal of count 2. The parties concede clerical error in the abstract of judgment. Other than amendment of the abstract of judgment, we find no error and affirm the judgment.

# FACTS

### Victim's Account of Incident to Detective Castaneda

Detective Castaneda questioned the victim Andrew Fern on October 11. The session was recorded with video and audio and played for the jury. A written transcript

---

[1]Unless otherwise designated, statutory references are to the Penal Code.

of the questioning was admitted into evidence as well. Castaneda was aware Fern was on probation and had an electronic monitor or global positioning system (GPS) tracking device.

Fern told Castaneda that on the day of the incident he went to his uncle's apartment. As Fern was playing a video game, Dulcinea Robinson came into his uncle's apartment, shut the door, and told Fern not to open the door if anyone came up behind her. She went into the back room; shortly thereafter someone pounded on the door. Fern opened the door. A male on the other side told Fern, "'it's not going down like this.'" Fern later identified that male as defendant in a photographic lineup.

Defendant told Fern that Robinson just "got" an ounce of defendant's "shit." Fern told defendant he had nothing to do with the woman. With defendant waiting outside the apartment behind the screen door, Fern walked to the back room and heard Robinson talking to Ariana Sullivan. Fern's uncle opened the door to the room and Fern saw Robinson holding a bag in her hand. Fern told Robinson it was stupid for her to have taken defendant's drugs. Fern took the bag from Robinson and brought it out to defendant. Defendant complained he did not receive all of the drugs because there had been an ounce. Fern agreed there was not an ounce in the bag. Defendant again told Fern it was not "going down like this."

Defendant said three quarters of the drugs were missing and demanded money. Fern told Robinson and the other people in the house that they needed to go outside and talk to defendant immediately. Defendant backed up a small, yellow SUV to the stairs leading to the second floor apartment. Fern told the others defendant was going to do something dumb. Fern saw defendant take something from under the hood of the SUV. Fern said defendant had a gun, asked the others who defendant was, and what they had been doing. Fern walked outside his uncle's residence because "kids" were present, walked down the stairs, and met defendant.

Defendant cocked the gun. Fern told him he did not need to do anything. Fern said he was going to go with defendant to keep people from going to jail. Fern confirmed defendant did not want the remnants of the bag, but money. Fern assured defendant they would try to get money. Fern rode with defendant in the SUV. On the way, defendant pistol-whipped Fern, who then grabbed defendant's arm and chest. The two struggled as the SUV slowly coasted.

Fern told defendant he was on a GPS monitor and that Fern would let go of defendant and let him keep his gun. Defendant drove to a residence on Oasis Street, parked, and talked to Fern. Defendant called someone on the phone; a heavy-set Hispanic man arrived, and he talked to defendant in Spanish. Defendant informed Fern that his brother wanted to "fucking execute" Fern. They went to another residence on North Norma and Coso, though Fern was not sure of the exact location. Defendant left the motor of his vehicle running, and they went inside the house.

Inside the residence, defendant called people and told them he had kidnapped Fern. Fern reminded defendant that Fern's actions had saved the young women at his uncle's home from being shot and defendant from going to jail. Fern told defendant that because he was not from the area, it was dumb of defendant to tell people he had kidnapped Fern. Fern also told defendant he was stupid for getting "jacked by a bunch of little fucking scally wags" and for assuming Fern had anything to do with it.

Defendant received a text offering $1,000 to release Fern and informing defendant a large group of White people were at the Oasis Street location. Defendant and Fern went in the garage. Defendant received another text that a group of White people were breaking the windows at the Oasis Street location. Defendant put a plastic tarp on the floor of the garage and told Fern to stand on it. Defendant jumped onto a vehicle parked in the garage. Fern asked defendant not to point the gun at him, and told defendant he did not need to shoot.

Fern persuaded defendant to let him make one quick call to find out what had happened. Fern called Russell Lester who told Fern he heard what happened, picked up Robinson, and some windows got broken. Fern told Lester he had been at a house on Oasis Street but he was now with defendant, he did not know defendant's name, and they were at a house defendant had been working on. Fern also told Lester defendant pulled a gun and was threatening to kill him. Defendant became more agitated.

Fern refused defendant's demand to get onto the tarp. Defendant threatened to shoot Fern in the arm. Fern kept the phone in his back pocket with the connection to Lester still open. Defendant held the gun with two hands about to fire, but Fern distracted him and then slapped the gun from defendant's grasp. Fern struck defendant in the face. Defendant stumbled backwards and Fern beat defendant on the face. As defendant fell over, two bullets were quickly fired from the gun.

Fern later learned Lester heard the shots over the phone and thought Fern had been shot. At that point, Lester slapped Robinson to the ground and then yelled at her for being stupid and dragging Fern into the situation. Robinson suddenly remembered the other place defendant might be located and told Lester to take her there. This was how Fern's friends went to the intersection of Norma and Coso.

Fern had gotten cut but thought he had been shot and ran out of the garage. Defendant fired two more shots. Defendant fired three more shots at Fern as he headed toward a fence. Fern rolled on the ground to avoid the gunfire. As Fern stood and looked back, defendant tried to fire the gun again but had run out of ammunition. Defendant demanded Fern lie on the ground. Instead, Fern jumped over a chain-link fence and hid in a nearby yard as defendant went back to the garage.

Fern watched defendant come back out of the garage, looking for Fern and assuming he had run down the alley. Fern saw defendant jump into his SUV and drive away. Fern described the gun as being a small, chrome .25-caliber. Fern described defendant as being Hispanic and not having a spider-web tattoo.

Castaneda and another officer had prepared a photo lineup that included defendant and five other people. Castaneda had training in the signs of methamphetamine intoxication and Fern did not appear to Castaneda to be under its influence. Fern's demeanor was calm until Castaneda handed him the photo lineup.

When Fern received the photo lineup, he became emotional and started to tear up. Just before Fern circled the picture and signed it, he asked Castaneda what was going to happen to him. Fern was concerned about being a snitch. Fern was aware the people who were arrested on October 6 had already provided a statement. Castaneda explained to Fern investigators had questioned an eyewitness, went to the location of the shooting with the witness, and found shell casings.

*Victim's Testimony*

Fern began his testimony stating he barely remembered the events of October 6, 2012.[2] Fern stated he had been in a program in Ridgecrest that required him to take a urine test. Fern had a GPS tracking device attached to him. Instead of walking across town, Fern walked to his uncle's house to get a ride. At his uncle's house, there were a couple of girls and "a dude" named Ryan from Bakersfield, who was "blasted up" with tattoos. Ryan was with his girlfriend, Dulcinea Robinson.

Fern's uncle would not let him inside the house. Fern left with Ryan on foot. Ryan kept trying to take Fern toward "stupid little dump places." Fern objected, explaining to Ryan he had to take a urine test. Ryan was a member of Fern's former gang, the East Kern Hellbound Peckerwoods. Ryan accused Fern of being a rat and started hitting him. But Fern had the better of Ryan and "dropped him." Fern called his friend Russell Lester for a ride, then jumped over a fence and walked down an alleyway away from Ryan.

Fern denied he went to Oasis Avenue, a place he called "the dump of Ridgecrest." Fern said he was about halfway down the alley, in the area of Norma and Coso, when law

---

[2]The dates surrounding the incident all refer to the year 2012.

enforcement arrived.  People had made reports of shots fired at Fern, but Fern did not remember any gunshots being fired.  The police picked up Fern two blocks away.  Fern's friends were lined up on the curb telling him he had been shot at.

Investigators questioned Fern about the incident four or five days later.  Fern testified that prior to being questioned, he had "slammed" methamphetamine with Southern Comfort and had also snorted a Xanax.  Fern explained he was intoxicated during questioning and did not remember much of what he told investigators.  Everything he told investigators was "a pretty big blur."  At trial, Fern said the account of events he told investigators was a story Robinson and Ariana Sullivan told him to say.  The two women had told Fern whom to identify during a lineup conducted at the jail.

A week after questioning, Fern cut off his ankle monitor because he realized he had wrongfully accused defendant.  Fern also wanted to run because he was afraid he would be killed.

*Eyewitnesses and Initial Investigation*

Donald Beaver testified he owned property on Norma Street, and defendant was working on that property on October 6.  Beaver knew defendant through his grandson, who had served time in prison with defendant.

Between 5:15 and 5:30 p.m. on October 6, John Froehner was in his driveway helping his sister's children into her vehicle when he heard three or four gunshots from Beaver's property on Norma Street.  Froehner saw a man with his arm over the fence and smoke coming from a gun.  There was a yellow SUV backed into the driveway of the house.  After the gunshots, the shooter loaded tools into the back of the SUV and drove away.  After the shooting, Froehner called 911.  Before police arrived, a group of people showed up in two cars and fanned out over the area.

Officer Kyle Cushman of the Ridgecrest Police Department was dispatched to investigate shots fired and people shouting just before the 6:00 p.m. end of his shift on October 6.  Cushman arrived at the corner of West Coso and Norma and saw several

7.

individuals with whom he had previous encounters, including Richard Caine, Jr., Luis Enriquez, Scott George and Dulcinea Robinson, who is also known as Ruvidia Robinson. Cushman had them sit on the curb. Another officer found Fern at West Ridgecrest Boulevard and Sunset and brought him back to Coso and Norma.

Fern told Cushman he had been in a fight with a male who was five feet five inches tall, weighed 230 to 240 pounds, and had a spider web tattoo on his right forehead. The man had called Fern a snitch. Fern did not tell Cushman someone had shot at him. Fern did not want to press charges and did not want to be a snitch.

Detective Manuel Castaneda and his partner found three spent shell casings from a .380-caliber semiautomatic firearm on the ground just inside the backyard of the property on Coso and Norma. There was a thick plastic painter's tarp in the garage of the property. The house was undergoing remodeling. No shell casings or bullet impact marks were found in the garage. Castaneda questioned Robinson, who said she had been "hanging out" with defendant and admitted stealing his drugs.

## GPS Evidence

Fern's GPS ankle monitor communicated with a cell tower every three minutes. On October 6, the monitor indicated Fern was at his uncle's apartment on West Wilson Avenue in Ridgecrest from 3:24 p.m. until 3:45 p.m. At 3:51 p.m., Fern was at the 11000 block of California Avenue. Between 3:57 p.m. and 4:06 p.m., Fern was on Oasis Drive. From 4:15 p.m. until 5:27 p.m. Fern was apparently at the same address on North Norma and Coso Avenue, although between 4:17 and 5:27 p.m., Fern's location on the monitor registered back and forth from Norma to Coso. Between 5:27 p.m. to 5:36 p.m., Fern was traveling from West Coso to the 500 block of Ridgecrest.

## In-Person Lineup

Daniel Stevenson, an investigator for the Kern County District Attorney's Office, visited Fern in jail on June 25, 2013. Fern told Stevenson he had been taken from a home and held by another person. Fern, who appeared to be afraid and did not want to testify,

8.

asked for protection or relocation. A couple of times Fern said he believed he would be killed if he testified. Fern appeared emotional and teared up as Stevenson was talking to him. That same day, an in-person lineup was conducted at the jail. Defendant was one of the subjects in the lineup. Fern did not identify defendant as the person who shot at him.

### Kite Evidence

On July 15, 2013, Kern County Sheriff Deputy Jeff Brockett transported inmates, including defendant, from the Lerdo pretrial facility to the courthouse on a bus. Fern was coming to court the same day on the same bus. Brockett searched the inmates before they boarded the bus and found a "kite," or note, in defendant's shirt pocket. The note said: "Hey bro. I need you to write me a letter saying that … Det Castaneda made you say all that, that he coered [*sic*] and intimidated you." Defendant's name, booking number, and pod number were written on the back of the note with the message, "we will get paid" with two dollar signs.

The parties stipulated defendant had been convicted of a felony prior to October 6. The parties further stipulated both defendant and Fern were ordered to court appearances on July 15, 2013.

### Defendant's Testimony

Defendant was in jail from September 13 until October 4. Defendant made a passing reference to taking psychotropic medication. Don Beaver hired defendant to remodel his house on North Norma. Defendant met Beaver's grandson in prison where defendant was serving a sentence for receiving stolen property. Defendant worked on Beaver's house from 6:00 or 7:00 a.m. on October 6 until he loaded up his tools to leave between 4:00 and 4:30 p.m. Defendant heard no gunshots that day. Defendant denied knowing Robinson or Fern, and he denied shooting at Fern. Defendant denied writing the kite found in his shirt. The kite was passed to him on the bus.

9.

# DISCUSSION

## I. Failure to File Section 1387 Motion

Defendant contends his trial counsel was ineffective for failing to file a motion pursuant to section 1387 to dismiss count 4, possession of a firearm by a felon (§ 29800, subd. (a)(1)). According to defendant, this count had been dismissed twice before for statutory cause and could not be filed a third time. We disagree.

### A. Prior Proceedings

This action began in Kern County as case No. RF006440A. Defendant was originally charged with three counts. Count 1 alleged assault with a firearm on October 6, 2012. Counts 2 and 3 alleged respectively that on October 12, 2012, defendant was a felon in possession of a firearm and a felon in possession of ammunition. At the preliminary hearing, Detective Castaneda testified concerning the incident on October 6, 2012. On November 21, 2012, an information with the same allegations was filed. On January 24, 2013, the court granted a section 995 motion filed by defendant as to counts 2 and 3, finding there was no evidence at the preliminary hearing concerning defendant's alleged status as a felon. The next day, the court granted the People's motion to dismiss the remaining allegation in the interests of justice.

A new criminal complaint was filed in case No. RF006526A on January 25, 2013, charging defendant with the same counts alleged in the prior action. On March 20, 2013, the prosecutor filed an amended complaint, adding allegations of attempted murder, count 1, and kidnapping for ransom, count 2. Assault with a semiautomatic firearm became count 3, and being a felon in possession of a firearm became count 4. All of the counts alleged the incident occurred on October 12, 2012.

At the preliminary hearing, Detective Castaneda testified concerning the incident on October 6, including the facts that Fern explained defendant possessed a semiautomatic pistol, fired shots at Fern, and four .380-caliber shell casings were found at the North Norma residence. A .22-caliber magnum revolver was found at defendant's

10.

residence when he was arrested October 12. A .380-caliber round cannot be fired from a .22-caliber revolver.

Defense counsel moved to have count 4 dismissed, among other reasons, based on a conflict in the October 6 and October 12 dates. The prosecutor made a motion to have the complaint amended to reflect the allegations occurred on October 6. The prosecutor pointed out the discrepancy in dates regarding count 4 resulted from the fact a gun was found in defendant's residence on October 12. The court asked the prosecutor which date applied to count 4. The prosecutor requested the dates for all counts in the amended information refer to October 6 based on the testimony at the preliminary hearing.

The court permitted the prosecutor to amend counts 1, 2, and 3 to reflect the offenses occurred on October 6. As to count 4, the court stated it was discharging defendant "for a failure of notice as to the alleged violation." The court acknowledged its finding was inconsistent with its holding order on count 3, assault with a semiautomatic firearm. It concluded, however, there was insufficient notice to the defendant regarding possession of a firearm on October 6, "especially since there is the confusion as to which acts they are attempting to charge the defendant with." Although the trial court did not cite any section of the Penal Code when it dismissed count 4, the clerk's minute order stated count 4 was dismissed for insufficient cause pursuant to section 871.[3]

**B.      Section 1387**

Section 1387 states that pursuant to its chapter, or to sections 859b, 861, 871, or 995, an order terminating an action "is a bar to any other prosecution for the same offense if it is a felony … and the action has been previously terminated pursuant to this chapter, or to Section 859b, 861, 871, or 995 …." Defendant argues his case was dismissed the second time by the magistrate pursuant to section 871 and further prosecution is barred by section 1387. We disagree for the following reasons.

---

[3]Section 871 permits the dismissal by the trial court of a criminal complaint for insufficient cause where "it appears either that no public offense has been committed or that there is not sufficient cause to believe the defendant guilty of a public offense …."

11.

As a preliminary matter, we note the magistrate did not make a finding pursuant to section 871 even though the clerk so indicated in the minute order. The court expressly noted a lack of fair notice to defendant as to which violation of section 29800, subdivision (a)(1), and on what date, he was being charged. The court's finding was neither an express nor an implied finding there was insufficient evidence to hold defendant on count 4. Where there is a discrepancy between the oral pronouncement of judgment and the minute order or abstract of judgment, the court's oral pronouncement generally controls over the clerk's minute order. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

The first dismissal occurred because there was no evidence before the court defendant was a felon. During the second preliminary hearing, the magistrate specifically identified the lack of notice to the defendant because there was evidence of two separate handguns, a .22-caliber weapon found in the defendant's residence on October 12, and shell casings from a .380-caliber gun fired by defendant on October 6. Thus, there was sufficient evidence from the second preliminary hearing to support two separate counts that defendant was a felon in possession of a firearm on two different dates. When the magistrate dismisses a count based on insufficient evidence, there is a dismissal within the meaning of section 871. This is so even without a formal order of dismissal where there is a decision not to hold the defendant. (*Brazell v. Superior Court* (1986) 187 Cal.App.3d 795, 800; *In re Williams* (1985) 164 Cal.App.3d 979, 983.) Here, because the trial court's dismissal was not based on section 871, the holdings of *Brazell* and *Williams* do not apply to the facts of the instant action.

Furthermore, because the evidence supported, for purposes of section 1387, two separate section 29800, subdivision (a)(1) offenses, defendant was not charged a third time with the "same offense." Instead of charging defendant with a violation of the statute on October 12, the information charged him with violating the statute on October 6. The evidence adduced at the second preliminary hearing supported an

allegation of this offense on either or both dates. We further agree with the People that a so-called "qualifying termination" did not otherwise occur pursuant to the chapter containing section 1387, or to sections 859b, 861, 871, or 995.

The parties devote a great deal of legal analysis of the California Supreme Court's case in *People v. Traylor* (2009) 46 Cal.4th 1205, 1211-1213. In *Traylor*, however, our high court was not analyzing the situation we have here, an allegation of two separate offenses occurring on two different occasions. Applying the statutory elements test, the Supreme Court in *Traylor* analyzed whether felony vehicular manslaughter had the same elements of the misdemeanor offense of negligent vehicular manslaughter and concluded the elements of both offenses were not the same. (*Ibid.*) We find the facts and analysis of the *Traylor* decision largely inapposite to those here.

Finally, we reject defendant's assertion that defense counsel was ineffective for failing to file a motion to dismiss count 4 pursuant to section 1387. To prevail on a claim of ineffective assistance of trial counsel, the defendant must establish not only deficient performance, which is performance below an objective standard of reasonableness, but also prejudice. Prejudice must be affirmatively proved. The record must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Because we have concluded there is no merit to his underlying section 1387 contention, defendant has failed to demonstrate prejudice.

## II. Alleged Instructional Error

Defendant was charged in count 2 of the information with kidnapping for ransom (§ 209, subd. (a)). The trial court asked defense counsel if he wanted an instruction for the lesser included offense of felony false imprisonment by violence, menace, fraud, or deceit (§ 237, subd. (a)). Defense counsel agreed to the trial court's proposal and the court informed the parties it would instruct the jury with CALCRIM Nos. 1240 and 3517. Defense counsel did not lodge an objection to the proposed instructions.

13.

Defendant contends that under the statutory elements test, kidnapping for ransom can be accomplished by means other than by force or fear. A violation of section 209, subdivision (a) can be accomplished by, among other things, seizing, confining, inveigling, enticing, abducting, and concealing. None of these means involve force or fear as defined in section 207, subdivision (a) for kidnapping. According to defendant, when this is so, the lesser included offense is not felony false imprisonment, an offense requiring violence or menace, but simple false imprisonment, which is only a misdemeanor under sections 236 and 237, subdivision (a).

Defendant contends defense counsel was ineffective for permitting his client to be convicted of a lesser related rather than a lesser included offense and that defense counsel was ineffective for failing to request instructions on the lesser included offense of misdemeanor false imprisonment. We reject these contentions because we find defendant had adequate notice of the lesser included offense of felony false imprisonment under the accusatory pleading test and there was no evidence presented at trial to support a jury finding of misdemeanor false imprisonment. Defense counsel, therefore, was not ineffective.

Our Supreme Court has applied two tests in determining whether an uncharged offense is necessarily included within a charged offense: the statutory elements test and the accusatory pleading test. The elements test is satisfied if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that all of the legal elements of the lesser offense are also the elements of the greater offense. If a crime cannot be committed without also necessarily committing the lesser offense, the latter is a lesser included offense within the greater. (*People v. Bailey* (2012) 54 Cal.4th 740, 748; *People v. Reed* (2006) 38 Cal.4th 1224, 1227-1228.)

Under the accusatory pleading test, a lesser offense is included within the greater charged offense if the facts alleged in the accusatory pleading include all of the elements of the lesser offense. (*People v. Bailey*, *supra*, 54 Cal.4th at p. 748; *People v. Reed*,

*supra*, 38 Cal.4th at pp. 1227-1228.) The accusatory pleading test arose to ensure that defendants receive notice before they can be convicted of an uncharged crime. (*People v. Reed*, *supra*, at p. 1229; *People v. Lohbauer* (1981) 29 Cal.3d 364, 368.) The accusatory pleading test is not applied where the defendant is charged with both the greater and lesser included offenses. (*Reed*, at pp. 1229-1231.) "Courts should consider the statutory elements and accusatory pleading in deciding whether a defendant received notice, and therefore may be convicted, of an *uncharged* crime, but only the statutory elements in deciding whether a defendant may be convicted of multiple *charged* crimes." (*Id*. at p. 1231.)

Even without the request of a party, the trial court has a duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence, including instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present. (*People v. Smith* (2013) 57 Cal.4th 232, 239.) "When the prosecution chooses to allege multiple ways of committing a greater offense in an accusatory pleading, the defendant may be convicted of the greater offense on any theory alleged …, including a theory that necessarily subsumes a lesser offense." (*Id*. at p. 244.) There must be substantial evidence the defendant committed the lesser offense without also committing the greater. The instruction on a lesser included offense must be given so long as there is substantial evidence to conclude the defendant violated the lesser offense without also violating the greater offense. (*Id*. at pp. 244-245.)

Applying these principles, we initially note that because there were not multiple charges alleging different crimes for the same conduct, we are not bound by the statutory elements test. We also do not reach the People's theory of invited error. We therefore analyze this issue using the accusatory pleading test. Under the accusatory pleading test defendant had more than adequate notice he could be convicted of the lesser included offense of felony false imprisonment.

15.

Detective Castaneda testified defendant used a gun to force the victim to travel with him and to detain him at two residences. Count 2 of the information alleged that on or about October 6, 2012, defendant willfully and unlawfully seized, confined, inveigled, enticed, decoyed, abducted, concealed, *kidnapped*, or carried away the victim with the intent to ransom or extort money or other valuable things from his relatives or friends. Among the theories alleged by the prosecution in the information, therefore, was that in violating section 209, subdivision (a), defendant kidnapped the victim. By definition, kidnapping (§ 207) involves use of force or fear. The force used against the victim need not be physical. The movement is forcible where it is accomplished through the giving of orders that the victim feels compelled to obey because he or she fears harm or injury from the accused. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1017.)

Felony false imprisonment under section 237, subdivision (a) is accomplished if "the false imprisonment be effected by violence, menace, fraud, or deceit." False imprisonment is the lawful violation of the liberty of another, compelling the victim to go where he or she does not wish to go or remain where he or she does not wish to remain. The offense may be committed by acts, words, or both, and by operating on the victim's will by personal violence. The crime becomes a felony when it is "effected by violence, menace, fraud, or deceit." (§ 237, subd. (a); see *People v. Reed* (2000) 78 Cal.App.4th 274, 280.) Violence is effectuated by the exercise of physical force to restrain the victim over and above the force reasonably necessary to achieve restraint. Menace is defined as a threat of harm by word or act, express or implied. (*People v. Reed*, *supra*, at p. 280.)

Count 2 of the information alleged the kidnapping for ransom was effectuated, inter alia, by kidnapping, which requires use of force or fear. Violence as used in section 237, subdivision (a) requires violence or menace, which are equivalent to force or fear. The facts presented at the second preliminary hearing and count 2 of the information provided defendant with notice of the force or fear element of felony false imprisonment.

16.

The evidence adduced at trial included the testimony of the victim and defendant that defendant was not involved in the incident. Defendant denied firing a gun or knowing the victim. The victim, however, gave a recorded statement to Detective Castaneda that soon after his initial encounter with defendant, defendant pulled a gun on him and continued to deploy it over the course of hours while he drove the victim to two different residences. The state of the evidence was that defendant was either not the perpetrator, or he violently abducted the victim and restrained him against his will. There was no evidence of simple abduction without force or fear, or evidence that during the course of the encounter the victim felt free to leave thereby making the encounter consensual.[4]

Under the accusatory pleading test defendant had notice count 2 was accomplished with violence or fear. The jury was presented with evidence defendant could have committed the offense of felony false imprisonment, a lesser included offense of kidnapping for ransom as it was alleged in count 2 of the information. There was no evidence presented that defendant detained the victim during the course of the entire encounter, especially during the encounter at the North Norma property, by means other than force or fear, the legal equivalents of violence and menace as set forth in section 237. Because there was no evidence of misdemeanor false imprisonment, the trial court had no basis to instruct the jury on that theory. (*People v. Smith*, *supra*, 57 Cal.4th at pp. 244-245.)

The instructions given by the trial court on the lesser included offense of felony false imprisonment were correctly given. Trial counsel was not ineffective for failing to object to these instructions or for failing to request an instruction on misdemeanor false imprisonment.

---

[4]The jury was instructed with CALCRIM No. 1240 that false imprisonment in violation of section 237, subdivision (a) accomplished by force or menace is a lesser crime to the crime alleged in count 2. The instruction included the definitions of unlawful restraint, violence, and menace. It also advised the jury the victim could not consent to the act.

17.

### III.    *Marsden* Hearings

*Introduction*

Defendant brought two *Marsden* motions prior to trial and two more *Marsden* motions after trial—one the day after the jury returned its verdict and the other just prior to sentencing.  Defendant contends the *Marsden* hearings demonstrated his trial counsel was ineffective and had an irreconcilable conflict with defendant necessitating appointment of substitute counsel.  Defendant further asserts the trial court should have appointed substitute counsel to investigate these claims and to determine whether to file a motion for new trial based on them.  As we explain, the trial court conducted full *Marsden* hearings and vetted all of the defendant's grievances.  We conclude defendant failed to make a colorable claim his trial counsel was ineffective, and the trial court did not err in denying defendant's request for substitute counsel.

#### A.    First Pretrial *Marsden* Motion

On May 29, 2013, the trial court heard defendant's first *Marsden* motion which was based on a written motion filed by defendant contending counsel failed:  to confer with defendant, subpoena witnesses favorable to the defense, investigate the case, prepare an affirmative defense at the preliminary hearing, secure expert witnesses, present crucial evidence, to declare a conflict with defendant because defense counsel acted as a surrogate prosecutor, and failed to give defendant his paperwork or preliminary hearing transcripts.  At the hearing, defendant told the court his counsel walked away from defendant and told defendant he had no time to talk to defendant.

Defense counsel, Mr. Revelo, responded he had met with defendant at the jail twice and was not present with defendant at arraignment.  Revelo explained defendant's case had been dismissed once before and the defense had been provided with discovery, including the preliminary hearing transcript.  Defendant indicated his frustration and counsel replied he "was customarily given clients that were considered to be difficult."  Revelo verified defendant's case had twice been dismissed.

18.

Revelo explained that due to defendant's frustration, he gets into a mindset in which it is impossible to argue with him. When Revelo told defendant he was continuing with the case, defendant became angry. Also, defendant wanted a copy of the preliminary hearing transcript, which counsel does not provide to prevent a defendant from showing it to others, such as cellmates who then testify against counsel's clients. Revelo told the court he ultimately communicates with his clients and it seems to work out. Defendant was upset because as soon as the original charges were dismissed, they were reinstated and he did not understand why. He also wanted a section 995 motion to be filed.

Revelo further pointed out he wanted to continue the case but defendant did not want to enter into a time waiver. Revelo explained, however, he needed time to prepare for trial by talking to witnesses and to file at least one motion based on double jeopardy because the case had been dismissed twice. Defendant faced a sentence of seven years to life, and Revelo felt a responsibility to protect his client's rights.

The trial court found Revelo had a sound reason for not providing defendant with copies of the preliminary hearing transcript or the police reports. The court did not find a breakdown in the attorney-client relationship and denied the *Marsden* motion. The court told defendant Revelo would need time to file a motion based on double jeopardy and to contact witnesses and he should strongly consider waiving time.

### B.    Second Pretrial *Marsden* Motion

The court conducted a second pretrial *Marsden* hearing on June 10, 2013. Defendant explained Phyllis Hix from Kernville had represented him earlier, but Revelo represented defendant at the second preliminary hearing on the refiled charges.[5] Defendant told the court he had insisted on his speedy trial rights and refused to waive time. Defendant told the court this was his second motion to relieve Revelo because he obviously had too many cases and no time for defendant's case. Defendant told the court

---

[5]In addition to Phyllis Hix, defendant had been represented by Roger Lampkin.

he wanted a physical lineup, not just a photo lineup. Defendant said he thought Revelo had lost his ambition after the preliminary hearing.

Defendant said he was not trying to pester Revelo, but Revelo would not communicate with him and had told him his former lawyer, Hix, was dying but this was not true. Revelo replied that defendant was referred to him because Revelo was becoming an expert in dealing with difficult clients. Revelo told defendant when he first met him that Revelo had been assigned to represent defendant because defendant was perceived as someone who was difficult to work with. Defendant had been twice escorted out of court because he was yelling and screaming. Revelo was not sure what was wrong with defendant but speculated his understanding of the case was "clouded by perhaps some mental condition." Revelo thought defendant was depressed and suffered from anxiety.

Revelo was delayed in working on defendant's case because he had been in trial continuously on five different cases since December 7, 2012. Two of those cases lasted six weeks. As for the motion, defendant would not waive his speedy trial right for Revelo to have time to prepare the motion. Defendant also had many other motions he wanted to file but Revelo could not convince him to do otherwise.

Revelo was concerned defendant did not seem to understand that if Revelo was relieved as counsel, the proceedings would be delayed while a new attorney investigated the case and reviewed the file. Revelo described defendant's conduct as "acts of desperation" because defendant did not believe he should be in custody. Revelo described defendant as having "frantic moods" where he would cry and had to be removed from the courtroom. Revelo told the court he should see "if there is, in fact, a mental health issue that is making it impossible for him to collaborate with counsel." Revelo further observed, "At this point I don't see that, but I think that I'm still unclear as to whether or not this is an issue covered in [section] 1368."

20.

Revelo explained he did not seek a physical lineup because he believed the photographic lineup was 100 percent positive and he was going to explore that point at trial. Revelo noted the physical identification of the perpetrator was different from defendant's appearance in the photographic identification. For tactical reasons, Revelo did not want to have a physical lineup that turned out to be a better identification. Revelo also believed that with more time passing between the photographic lineup and trial, it was possible the victim would not make a positive identification of defendant.

Revelo did not intend to file a suppression motion because there was no evidence to suppress. A prosecutor had mentioned to Revelo that defendant's former counsel was dying and Revelo mentioned it to defendant. Revelo also intended to file a motion to dismiss the case pursuant to section 995 because it had been filed twice before. Defendant reviewed the procedural history of the case with the court and complained it had been filed again by the prosecutor. A lengthy exchange then occurred between the trial court and Revelo concerning the pros and cons of having a physical lineup. Revelo concluded it was a bad idea but he would bring a motion to do so if defendant sought it. The court denied the *Marsden* motion.

### C.    *Marsden* **Motion After Jury Verdict**

On August 28, 2013, the day after the jury reached its verdict, defendant brought a *Marsden* motion reiterating most of his grievances against Revelo lodged during the first two *Marsden* hearings. Defendant complained his case had been dismissed before. In addition, Revelo had a heavy caseload, had failed to file written motions, and only saw defendant twice in over seven months. Defendant believed the victim's identification of him was tainted.

Defendant noted he never waived time though there were complications in his case. Defendant alleged the defense investigator threatened him, there was no communication between counsel and defendant, and Revelo repeatedly failed to represent him. Defendant claimed Revelo was overworked and fell asleep twice during trial.

21.

Defendant argued the police report indicated the assailant was a White person and this was not brought to the jury's attention.

Defendant complained gas stations and fast food restaurants with video cameras were not investigated by Revelo for video footage that would have cleared defendant. Defendant was unhappy Revelo made stipulations to the jury. Because defendant was not familiar with Ridgecrest, he needed a realtor to guide him step-by-step through his locations the day of the incident in order to corroborate his story. Defendant complained that when he wanted to talk about the motions he sought to have Revelo file for him, the trial court would refer defendant back to his attorney. The court explained it was unethical for the court to listen to the substance of motions that were to be brought to him or to advise defendant on whether to file such motions.

Defendant asserted that even while in court, Revelo would not talk to him. Defendant stated Revelo kept insisting the People had no case against him. The court noted that after 30 minutes of talking, defendant had said nothing new in nearly 10 minutes, was venting at Revelo, and the court was not going to permit defendant to continue doing so. Defendant felt Revelo failed to file pretrial motions, including a suppression motion and one for vindictive prosecution.

Revelo responded to defendant's motion by first pointing out that defendant had two prior attorneys who indicated he could be a problem. Revelo noted that during his testimony defendant mentioned taking psychotropic medication, this was the first time Revelo had heard this information, and it would have been nice for Revelo to have heard this earlier. Revelo observed that among the things defendant did to "bury" himself in this case was to have a kite in his pocket. Revelo had asked defendant if the GPS evidence would place the victim at the Oasis property and defendant assured him it would not, but that was exactly what the GPS evidence confirmed.

Revelo's investigator talked to jurors after they reached their verdicts and they told the investigator the GPS evidence from Fern's monitor was key evidence leading to

22.

defendant's guilt. The GPS evidence also placed Fern at the Coso address, a difficult fact for Revelo to refute. Revelo could not obtain video footage from the gas station or fast food restaurants because months had passed prior to Revelo taking on the case. Revelo asked defendant to waive time, defendant refused, Revelo did what defendant wanted, and the result was defendant's conviction. Revelo pointed out that the "jail-house attorneys" defendant consulted only made Revelo's job more difficult. Revelo referred to this case as a textbook example of an attorney asking the client for information and getting lies.

Revelo explained he was not going to subpoena the GPS evidence. Defendant would not waive time in order to file motions. The section 995 motion was more complicated and Revelo did not have enough time to prepare it. When Revelo asked for more time, defendant told him no.

In denying the *Marsden* motion, the trial court found no ineffective assistance of counsel and no breakdown in the communication between attorney and client. In discussing the section 995 motion that was brought in the original action, the court noted it had been brought as to the kidnapping for ransom allegation. The court found that Revelo was not ineffective for failing to file other motions, especially when defendant was insistent on not waiving time for Revelo to prepare the motions. The court noted an attorney could not be expected to do the impossible.

The court also noted that from its perspective hearing all the evidence, Revelo effectively presented a defense. The court observed that Revelo's defense led to an acquittal of kidnapping for ransom, which carried a life sentence, and resulted in a conviction for false imprisonment with a sentence of something like eight months. The court found Revelo's representation to be effective. The court further observed it permits trial counsel to send communications using their cell phones if it assists them in their work, and Revelo's use of his phone during trial did not establish counsel was ineffective. The court found that on no occasion during trial did Revelo appear to be asleep.

23.

## D.  Final *Marsden* Motion

On October 25, 2013, the trial court heard defendant's motion to substitute his trial attorney and for substituted counsel to investigate grounds to file a motion for a new trial based on ineffective assistance of counsel.  Defendant asserted he had a mental health condition and the medication he took did not improve the immense emotional and psychological strain he was under during trial.  This led to him have racing thoughts and to hear voices in his head.  Defendant claimed Revelo was retaliating against him for complaining to the California State Bar, there was no evidence defendant had possessed a gun or ammunition, and Revelo was ineffective for failing to file motions from the first day he represented defendant.  Defendant asserted Revelo should have filed a section 1368 motion for a competency hearing.

Defendant told the court his diagnosis for schizophrenia was newly discovered evidence.  When asked by the court how this was a newly discovered situation if defendant had known he had this condition for a long time, defendant replied that Revelo did not know about the condition.

Defendant claimed Revelo disrespected him with slander, and he attached letters from himself and two other prisoners complaining to the State Bar of California concerning Revelo's conduct.  Defendant said Revelo was texting on his phone throughout the trial and maliciously slandered defendant to other inmates.  Defendant had a realtor working with him to retain another attorney.  According to defendant, Revelo was merely a surrogate for the prosecutor.

Defendant thought Revelo should have investigated witnesses who lived near the shooting.  Defendant thought Revelo should have filed a section 995 motion to challenge the sufficiency of the evidence presented at the preliminary hearing and a motion to compel a lineup.  Defendant acknowledged he had a lineup in which the victim failed to identify him on June 24, 2013.  Defendant wanted the photographic lineup suppressed. The trial court explained to defendant that a lineup is only suppressed when it is constitutionally unlawful for being unduly suggestive.

24.

In response to defendant's allegations of misrepresentation, misconduct, and ineffective representation, Revelo told the court defendant never said anything to him about hearing voices, having racing thoughts, or taking psychotropic medication. Revelo explained defendant was "extremely coherent" and "very convincing" when he wants to be. But when he talks about his mental health issues, defendant begins to stutter and claims his thoughts are racing. Revelo thought defendant may have thought this out a long time ago as an example of newly discovered information and strategically withheld key information from his counsel in order to use it last minute.

Revelo observed most defense attorneys in Kern County have gone to trial on competency hearings on a showing less than that made by defendant. Revelo said he was currently engaged in such a trial. Revelo never saw any documentation to verify defendant was schizophrenic, though defendant indicated he just obtained this documentation.

Revelo did not believe he should have filed a section 1368 motion challenging defendant's competency when he had no information or basis to do so. Although defendant had been "a little bit of a problem client," Revelo had many of those and this representation was nothing new. Revelo reiterated his point from earlier *Marsden* hearings that he did not have time to file motions because defendant would not enter into time waivers to give Revelo the opportunity to do so. Revelo stated defendant had been acquitted of kidnapping for ransom, and filing a section 995 motion on that count would not have changed the outcome of the case.

Revelo noted that during the physical lineup conducted, defendant tried to wear glasses, which he does not wear, but the guards told him to take them off. The victim did not identify defendant during that lineup and during his testimony repeatedly described another assailant.

Revelo and his investigator had both asked defendant about whether the GPS readings would conform to Fern's earlier account of where he had been. Defendant told

25.

them it would not. Revelo adamantly denied assisting the prosecutor and said he never divulged any tactics to the prosecutor, and would never do so. The GPS evidence was presented to the jury and it established defendant's guilt to the jury. The prosecutor assisted the defense in obtaining the GPS evidence. Revelo did not want to introduce the GPS evidence if it would lead to defendant's conviction, but defendant wanted the evidence introduced. Revelo believed defendant was calculating his mental health claim and the last minute introduction of the GPS evidence to lead the court to make the wrong conclusions.

Revelo explained that he closes his eyes during trial to "look [like] a very convincing sleeping attorney" and then jumps out of his chair at any time it is necessary. He uses this device to cue the jury that a point is not important. Revelo said he also yawns to get jurors to do so, much to the horror and anger of prosecutors. He employs this theater to defend his clients. Revelo denied ever sleeping during defendant's trial. The trial court gave defendant an opportunity to respond to Revelo's remarks, but defendant reiterated points he had made earlier in this and previous *Marsden* hearings.

The trial court initially noted that much of what defendant presented had been brought before the court during the previous *Marsden* hearing. The court described defendant's tactic since the jury's verdict as "a full scale nonstop attack on Mr. Revelo as being the party responsible for the verdict." The court found no credible evidence that Revelo shared trial tactics with the prosecutor, violated the attorney-client privilege, or became a surrogate prosecutor because defendant filed a complaint with the state bar.

The court found Revelo vigorously represented defendant at trial and did so effectively even when obstacles like the GPS evidence were thrown in his path. The court noted the jury acquitted defendant of the section 209 kidnapping for ransom charge, which carries a life sentence. The court found that although there would have been a basis for a section 995 motion on the section 209 allegation, the failure to file it resulted in no prejudice to defendant.

26.

The court observed Revelo's trial tactics created confusion for the jury concerning the importance of the GPS records and whether they were significant. The court found Revelo was both effective and far from being a surrogate prosecutor. The court noted Revelo continued to do a zealous and effective job on defendant's behalf despite the fact the relationship between attorney and client was not the best the court had observed.

The court found no basis to grant defendant's motion for a new trial based on insufficiency of the evidence. The court also found no basis for granting the new trial motion based on ineffective assistance of counsel because Revelo permitted defendant to testify. The court stated defendant had an absolute constitutional right to testify. The court observed that Revelo had not slept during trial.

The court noted it seriously considered defendant's assertion of newly discovered evidence based on a mental health condition. The court had the opportunity to personally observe defendant more extensively than in other cases because the court saw defendant during trial and during the *Marsden* hearings. The court was not sure if defendant in fact had a mental health condition, assumed for the record that he did, and found defendant was not incompetent to stand trial. The court noted a section 1368 motion cannot be brought merely because a defendant has mental health issues. Such a motion should only be brought where there is substantial evidence an individual is not competent to stand trial. The court stated it had observed no evidence during trial to support defendant's current claim of incompetency and Revelo was not ineffective for failing to raise defendant's competency as an issue.

The court found no basis to defendant's assertion that other witnesses should have been called or to his claim that a new lineup should have been made. The court stated the latter point was especially true because defendant had already undergone an in-person lineup and the results were favorable to him. The court explained it was vigilant for any sign of a breakdown in the attorney-client relationship that could lead to ineffective assistance of counsel and did not see that happening.

27.

The court found no breakdown in communication between attorney and client that resulted in ineffective representation, and Revelo's continued representation would not impair defendant's right to effective assistance of counsel in the remainder of the proceedings. After the *Marsden* hearing, Revelo made an oral motion to suspend the proceedings pursuant to section 1368 to determine defendant's competency. The trial court denied the motion.

### E.    Standard for Appointing Conflict Counsel

On appeal, defendant contends Revelo essentially stated defendant was malingering concerning his mental health during the final *Marsden* hearing, but during the second pretrial hearing Revelo inconsistently expressed doubt concerning defendant's mental health status. Defendant argues that during the final hearing, Revelo gratuitously revealed his confidential communication with defendant regarding defendant's demand for introduction of the GPS evidence, which did not respond to his own ineffectiveness but to impress to the court defendant lied to his counsel. According to defendant, Revelo did this to remain employed on the case.

Defendant challenges Revelo's failure to file pretrial motions based on time constraints due to defendant's failure to enter into time waivers. Defendant argues instead that Revelo was too busy on other cases. Also, Revelo allegedly failed to call defense witnesses. Defendant characterizes all of the alleged deficiencies in Revelo's representation as ineffective assistance of trial counsel and a conflict of interest between attorney and client.

When a defendant seeks to substitute his or her appointed counsel and asserts inadequate representation, the trial court must permit the defendant to explain the basis of that contention and to relate specific instances of counsel's alleged inadequate performance. A defendant is entitled to relief if the record clearly demonstrates the appointed attorney fails to provide adequate representation or that the defendant and counsel have become embroiled in such an irreconcilable conflict ineffective

representation is likely to result.  The decision whether to grant a substitution of counsel is within the discretion of the trial court.  Appellate courts will not find an abuse of that discretion unless the failure to substitute appointed counsel would substantially impair the defendant's right to effective assistance of counsel.  (*People v. Roldan* (2005) 35 Cal.4th 646, 681, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  Where the complaints of counsel's ineffectiveness involve tactical disagreements, we do not find *Marsden* error.  (*People v. Dickey* (2005) 35 Cal.4th 884, 922.)

If the defendant's claim of inadequate representation relates to courtroom events the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel.  If the defendant's assertion of inadequate representation relates to matters that occurred outside the courtroom, and the defendant makes a so-called colorable claim of inadequacy of counsel, the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial.  (*People v. Smith* (1993) 6 Cal.4th 684, 692-693.)

To the extent there is a credibility question between the representations of a defendant and his or her counsel, the trial court is entitled to accept counsel's explanations.  Heated exchanges between the attorney and defendant are not enough by themselves to warrant substitution of counsel absent an irreconcilable conflict. "Moreover, a defendant may not force the substitution of counsel by his own conduct that manufactures a conflict."  (*People v. Smith*, *supra*, 6 Cal.4th at p. 696.)

### F.     Competency to Stand Trial

Due process is violated when a mentally incompetent person undergoes a criminal trial.  A defendant is not incompetent if he or she can understand the nature of the legal proceedings and assist counsel in conducting a defense in a rational manner.  A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence

by the party challenging his or her competency. (*People v. Blacksher* (2011) 52 Cal.4th 769, 797; *People v. Kaplan* (2007) 149 Cal.App.4th 372, 382-383.)

Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. A reviewing court gives great deference to the trial court's decision whether to hold a competency hearing. When there is less than substantial evidence, the trial court still has discretion to order a competency hearing. The trial court's decision whether to order a competency hearing is given great deference because the trial court has had the opportunity to observe the defendant during trial. (*People v. Kaplan*, *supra*, 149 Cal.App.4th at p. 383.)

The People argue that Revelo did not identify a mental health condition that would give rise to a section 1368 proceeding during the *Marsden* hearing on June 10, 2013. In that hearing, Revelo informed the court that defendant's mental status indicated potential mental illness due to depression, anxiety, and what Revelo called frantic moods, but did not rise at that time to the level of doubt as to defendant's competency to stand trial.

Revelo gave the court a frank description of a client who alleged mental health symptoms in order to create the appearance of new evidence. What Revelo described during the second *Marsden* hearing in June 2013 was depression and some frantic moods by the defendant. Importantly, Revelo did not describe behavior by the defendant that would lead him to file a section 1368 motion to suspend the proceedings. For instance, neither defendant nor Revelo indicated during any of the *Marsden* hearings that they had difficulty communicating with or understanding each other. The fact Revelo saw his client in a distraught mood during pretrial proceedings would not, by itself, have been an indication he needed to file a section 1368 motion.

Revelo expressed some doubt during the hearing over whether he would need to file a motion pursuant to section 1368, but ultimately decided not to do so. During the second posttrial *Marsden* hearing, Revelo informed the court defendant made reference to taking medication for schizophrenia for the first time during the trial.

30.

Revelo said he saw no prior behavior to corroborate defendant's assertions of racing thoughts and hearing voices and defendant never informed counsel of this condition. Revelo noticed defendant was coherent and convincing when he wanted to be, but would change his behavior when he talked about his mental health. Revelo believed defendant waited to raise this point until after trial to create a claim of newly discovered evidence and had formed this as a tactic. Revelo described a defendant who apparently turned his symptoms on and off like a faucet.

The trial court shared Revelo's observation that defendant demonstrated no behavior during trial warranting a suspension of proceedings pursuant to section 1368. There is no indication of any behavior by defendant before or during trial, or during the four *Marsden* hearings, to support his assertion of incompetency due to mental illness.

A defendant who has developed a sophisticated strategy such as this is displaying a great deal of forethought; the opposite of someone who is legally incompetent to stand trial because he or she does not understand the nature of the charges or proceedings. Defendant failed to speak to Revelo concerning his alleged mental illness until they were in the final *Marsden* hearing just prior to sentencing. Furthermore, defendant did not raise his mental competence during the first posttrial *Marsden* hearing immediately after the conclusion of jury deliberations on August 28, 2013. Under these circumstances the trial court could reasonably conclude defendant's assertion of incompetency was feigned and that he sought to inject error into the proceedings. (*People v. Smith*, *supra*, 6 Cal.4th at p. 696; see *People v. Roldan*, *supra*, 35 Cal.4th at p. 682.) The trial court was entitled to weigh defendant's credibility, as well as that of trial counsel. The trial court's finding defendant was competent was supported by substantial evidence.

In *Smith*, the Supreme Court required the defendant show only a colorable claim of inadequacy of counsel. (*People v. Smith*, *supra*, 6 Cal.4th at p. 693.) The question we resolve is whether defendant made a colorable claim Revelo inadequately represented him for failing to have a hearing before or after trial to determine his competency. Based

31.

on the extensive *Marsden* hearings conducted before and after trial, we conclude defendant has not made a colorable claim of inadequate representation by his trial counsel based on defendant's belated assertions of his own incompetency.[6]

## G.    Other Alleged Conflicts Between Attorney and Client

Defendant raises other issues on appeal involving alleged conflicts with his trial counsel.  We note Revelo was honest during the *Marsden* hearings about defendant being a difficult client.  Revelo pointed out his willingness to always work with such clients.  Neither Revelo nor defendant suggested a breakdown in basic communication or an inability to work together during trial.  For instance, Revelo was not certain the defense should seek the GPS evidence, but did so at defendant's insistence this evidence was exculpatory.  Revelo acceded to his client's wishes.  The People accurately argue this is an example showing there was not an irreconcilable conflict between attorney and client.

We also reject defendant's argument that in discussing this point during the *Marsden* hearings, Revelo violated defendant's confidences.  The very purpose of the in camera procedure of a *Marsden* hearing is for defendants and counsel to confidentially explore potential conflicts between them.  Disclosure of otherwise privileged information in the attorney-client relationship is a common result.  (See *People v. Knight* (2015) 239 Cal.App.4th 1, 6-8 [defendants entitled to use immunity for facts disclosed in *Marsden* hearing, citing *People v. Dennis* (1986) 177 Cal.App.3d 863, 874-876].)

Defendant argued there were time constraints on Revelo creating a conflict of interest.  During the *Marsden* hearings, however, Revelo explained defendant made it difficult to bring pretrial motions because he would not permit time waivers.  This is another example of defendant injecting error into the proceedings by arguably

---

[6]We are aware that after the fourth *Marsden* hearing, Revelo made a motion to suspend the proceedings pursuant to section 1368.  Based on a record in which trial counsel has painted a picture of a very thoughtful and engaged client, we do not find Revelo's motion to be a concession his client has made a colorable claim of inadequate representation.  The motion was likely made by Revelo out of an abundance of caution.

unreasonable conduct before trial.  (*People v. Smith*, *supra*, 6 Cal.4th at p. 696; see *People v. Roldan*, *supra*, 35 Cal.4th at p. 682.)  Furthermore, the trial court was entitled to accept Revelo's representations over those made by defendant.  (*Smith*, *supra*, at p. 696.)

Defendant further complains Revelo failed to:  investigate the case, consult with defendant's prior attorney, and file pretrial motions, especially a section 995 motion for being a felon in possession of a firearm, which was twice dismissed.  All of these claims are either speculative or, as in the case of the section 995 motion, not legally viable as discussed in part I, *ante*.  Again, to the extent there is a credibility question between the representations of a defendant and his or her counsel, the trial court is entitled to accept counsel's explanations.  (*People v. Smith*, *supra*, 6 Cal.4th at p. 696.)

Through a very selective reading of the record—and failing to give any deference to trial counsel's explanations or the trial court's observations and factual findings— appellate counsel has attempted to create a picture of Revelo as ineffective and in irreconcilable conflict with his client.  We find this portrait entirely at odds with what occurred at trial and during the extensive and exhaustive *Marsden* hearings.  Revelo worked diligently on a difficult case made more difficult by defendant's apparently deliberate actions to inject error into the proceedings.  He maintained his professionalism, provided defendant with effective assistance of counsel, and effectively communicated with a difficult client.

Defendant was given ample opportunity during all four *Marsden* hearings to explain the reasons for his request for new counsel.  (*People v. Diaz* (1992) 3 Cal.4th 495, 574-575; *People v. Vera* (2004) 122 Cal.App.4th 970, 979.)  We conclude the trial court did not err in denying defendant's motion for substitute counsel.

## IV.    Clerical Error

The abstract of judgment incorrectly reflects the firearm enhancement (§ 12022.53, subd. (c)) on count 3 was stayed.  The trial court granted the People's

motion to dismiss that enhancement.  The abstract of judgment further reflects there were nine prior prison term enhancements (§ 667.5, subd. (b)) that were stayed by the trial court.  In fact, there were only three prior prison term enhancements alleged in the information and they were dismissed by the trial court.  The parties concede the abstract of judgment requires correction.  Clerical errors such as these can be corrected at any time, including on appeal.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *In re Candelario* (1970) 3 Cal.3d 702, 705.)

## DISPOSITION

The trial court is directed to correct the abstract of judgment to reflect the gun use enhancement alleged in count 3 and the three alleged prior prison term enhancements were dismissed.  The court shall forward the corrected abstract of judgment to the appropriate authorities.  The judgment is affirmed.

_____

PEÑA, J.

WE CONCUR:


_____

HILL, P.J.


_____

LEVY, J.